COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE UNIVERSITY OF TEXAS AT EL PASO, | § | No. 08-06-00271-CV |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| v. | | County Court at Law No. 3 |
| | § | |
| | | of El Paso County, Texas |
| ALFREDO HERRERA, | § | |
| | | (TC# 2006-2770) |
| Appellee. | § | |

**O P I N I O N**

This is an interlocutory appeal from the trial court's denial of a plea to the jurisdiction filed by the University of Texas as El Paso ("UTEP"). At issue is the self-care provision of the Family and Medical Leave Act. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

Alfredo Herrera was employed by UTEP as a heating, ventilation, and air-conditioning technician from 2002 to 2006. In March 2005, Herrera suffered an on-the-job injury to his elbow and was on medical leave until he returned to work on January 4, 2006. Less than a week later, Herrera re-injured his elbow at work. On January 27, 2007, Herrera's employment was terminated for failure to cooperate with his supervisor, refusal to follow instructions, failure to adhere to established rules and regulations, and disorderly and disruptive conduct. Herrera brought an employment discrimination suit against UTEP complaining he was terminated in retaliation for

taking leave under the self-care leave provision of the Family and Medical Leave Act.[1]  UTEP filed a plea to the jurisdiction alleging Herrera's retaliation claim is barred by sovereign immunity.  The trial court denied the plea to the jurisdiction and UTEP filed notice of appeal.

## SOVEREIGN IMMUNITY

UTEP raises three issues challenging the trial court's denial of its plea to the jurisdiction. It argues that the State did not voluntarily waive its sovereign immunity either in the Texas Constitution or by statute, and the UTEP Handbook of Operating Procedures cannot waive the State's sovereign immunity.  Further, UTEP asserts that Congress did not validly abrogate state sovereign immunity from suit under the FMLA's self-care provision, and therefore, the trial court erred by denying the plea to the jurisdiction.

### Standard of Review

When a lawsuit is barred by sovereign immunity, the trial court lacks subject matter jurisdiction, and dismissal with prejudice is proper.  *City of Austin v. L.S. Ranch, Ltd.*, 970 S.W.2d 750, 752 (Tex.App.--Austin 1998, no pet.).  A plea to the jurisdiction is a dilatory plea by which a party contests the trial court's authority to determine the subject matter of the cause of action.  *City of Saginaw v. Carter*, 996 S.W.2d 1, 2 (Tex.App.--Fort Worth 1999, pet. dism'd w.o.j.); *State v. Benavides*, 772 S.W.2d 271, 273 (Tex.App.--Corpus Christi 1989, writ denied).  The plaintiff has the burden to allege facts affirmatively demonstrating that the trial court has subject matter jurisdiction.  *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440, 446 (Tex. 1993); *City of Saginaw*, 996 S.W.2d at 2.  Subject matter jurisdiction is a legal question which we review *de novo*.  *City of Saginaw*, 996 S.W.2d at 2; *Texas Department of Health v. Doe*, 994 S.W.2d

---

[1]  Herrera's suit also includes an allegation that he was terminated for exercising his First Amendment right to complain about being required to work unsafely and use unsafe equipment.  This appeal pertains only to the FMLA claim.

890, 892 (Tex.App.--Austin 1999, pet. dism'd). We consider the allegations in the petition and accept them as true. *See City of Saginaw*, 996 S.W.2d at 2-3. The plaintiff's jurisdictional pleadings are to be construed liberally in the plaintiff's favor and we look to the pleader's intent. *See Texas Association of Business*, 852 S.W.2d at 446. When deciding a plea to the jurisdiction, a court is not required to look solely to the pleadings, but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Bland Independent School District v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *see County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

*Family and Medical Leave Act*

The FMLA authorizes qualified employees to take up to 12-weeks of unpaid leave from their jobs during any 12-month period for one or more of the following reasons:

(A)     Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B)     Because of the placement of a son or daughter with the employee for adoption or foster care.

(C)     In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D)     Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(E)     Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on active duty (or has been notified of an impending call or order to active duty) in the Armed Forces in support of a contingency operation.

29 U.S.C.A. § 2612(a)(1)(West 1999). Subsection (C) is often referred to as the family-care provision while Subsection (D) is referred to as the self-care provision. The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA. 29 U.S.C.A. § 2615(a)(1). It is unlawful for any

employer to discharge or otherwise discriminate against any individual opposing any practice made unlawful by the FMLA. 29 U.S.C.A. § 2615(a)(2). It also is unlawful for any employer to discharge or in any other manner discriminate against any individual because the individual has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to the FMLA. 29 U.S.C.A. § 2615(b).

### Sovereign Immunity

The Eleventh Amendment to the U.S. Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST.AMEND. XI. The Eleventh Amendment does not create or grant immunity but rather recognizes that states as separate sovereigns can limit, with few exceptions, their susceptibility to suit. *Hoff v. Nueces County*, 153 S.W.3d 45, 48 (Tex. 2004), *citing Alden v. Maine*, 527 U.S. 706, 728-29, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Federal courts have no jurisdiction over federal or state law claims against a state or state agency unless Eleventh Amendment immunity has been expressly waived by the state or abrogated by Congress pursuant to proper constitutional authority. *Hoff*, 153 S.W.3d at 48. Further, Eleventh Amendment immunity protects nonconsenting states from being sued in their own courts for federal law claims. *Id.*

### Abrogation of Sovereign Immunity by Congress

Congress may abrogate the States' sovereign immunity if it manifests its intention to abrogate in the language of the statute and if it acts pursuant to a valid exercise of its power under Section 5 of the Fourteenth Amendment. *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 726, 123 S.Ct. 1972, 1976, 155 L.Ed.2d 953 (2003). The FMLA enables employees to seek damages against any employer, including a public agency, in any federal or state court of competent

jurisdiction. 29 U.S.C.A. § 2617(a)(2). The FMLA defines public agency to include both the government of a state or political subdivision and any agency of a state or a political subdivision of a state. 29 U.S.C.A. § 203(x)(West Supp. 2008); 29 U.S.C.A. § 2611(4)(A)(iii). Based on this language in the statute, the Supreme Court found in *Hibbs* that Congress made unmistakably clear its intention to abrogate the States' sovereign immunity. *Hibbs*, 538 U.S. at 726, 123 S.Ct. at 1977.

In addressing whether Congress acted within its constitutional authority when it sought to abrogate the State's immunity for purposes of the FMLA's family-leave provision found in § 2612(a)(1)(C), the Supreme Court noted that two provisions of the Fourteenth Amendment are relevant to the inquiry: Section 5 grants Congress the power to enforce the substantive guarantees of §1, which includes equal protection of the laws, by enacting appropriate legislation. *Hibbs*, 538 U.S. at 726-27, 123 S.Ct. at 1977. Congress may, in the exercise of its §5 power, do more than simply proscribe unconstitutional conduct. *Id.*, 538 U.S. at 727, 123 S.Ct. at 1977. Its §5 power to enforce the substantive guarantees of §1 of the Fourteenth Amendment includes the authority to both remedy and deter violation of guaranteed rights by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden. *Id.* In other words, Congress may enact prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct. *Id.*, 538 U.S. at 727-28, 123 S.Ct. at 1977. Section 5 legislation reaching beyond the scope of §1's actual guarantees must be an appropriate remedy for identified constitutional violations, not an attempt to substantively redefine the State's legal obligations. *Hibbs*, 538 U.S. at 728, 123 S.Ct. at 1977. The legislation must exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. *Id.*, 538 U.S. at 728, 123 S.Ct. at 1977-78.

UTEP asserts that in recent years the Supreme Court has used the proportionality and

congruence test to invalidate several congressional attempts to exercise its §5 power. We understand UTEP to argue that it is extremely difficult for Congress to successfully abrogate state sovereign immunity. In support of this argument, it cites *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999), *Kimel v. Florida Board of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), and *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Unlike the instant case, none of these cases involved a gender-based classification or other classification subject to a heightened level of scrutiny. This distinction is significant because it impacts our review.

The FMLA aims to protect the right to be free from gender-based discrimination in the workplace. *Hibbs*, 538 U.S. at 728, 123 S.Ct. at 1978. State gender discrimination triggers a heightened level of scrutiny. *Id.*, 538 U.S. at 728 and 736, 123 S.Ct. at 1978 and 1982. To survive such heightened scrutiny, the gender-based classification must serve important governmental objectives and the discriminatory means employed must be substantially related to the achievement of those objectives. *Id.* Because the standard for demonstrating the constitutionality of a gender-based classification is more difficult to meet than the rational basis test, it is easier for Congress to show a pattern of state constitutional violations. *Id.*, 538 U.S. at 736, 123 S.Ct. at 1982.

In *Hibbs*, the Supreme Court examined whether Congress had evidence of a pattern of constitutional violations on the part of the States with regard to gender-based discrimination in the workplace. *Id.*, 538 U.S. at 729, 123 S.Ct. at 1978. It found that Congress had before it evidence that, despite the passage of Title VII of the Civil Rights Act of 1964[2], gender discrimination did not cease and women still faced pervasive discrimination in the job market. *Id.*, 538 U.S. at 729-30, 123

---

[2] 42 U.S.C.A. § 2000e *et seq.*

S.Ct. at 1978-79. Further, there was evidence that States continued to rely on invalid gender stereotypes in the employment context, specifically in the administration of leave benefits. *Id.*, 538 U.S. at 730, 123 S.Ct. at 1979. These stereotypes included beliefs that women's family duties trumped those of the workplace, caring for family members is women's work, and men do not have the same domestic responsibilities as women. *Id.*, 538 U.S. at 731 n.5, 123 S.Ct. at 1979 n.5. The impact of these stereotypes on leave administration by employers forced women to continue to assume the role of primarily family caregiver and fostered stereotypical views about women's commitment to work and their value as employees. *Id.*, 538 U.S. at 736, 123 S.Ct. at 1982. This in turn led to subtle discrimination against women in the workplace. *Id.* Thus, the Supreme Court found that the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic §5 legislation. *Id.*, 538 U.S. at 735, 123 S.Ct. at 1981. Since *Hibbs* was decided, four federal courts of appeals have found Congress did not validly abrogate immunity for claims based on the self-care provision. *Nelson v. University of Texas at Dallas*, 535 F.3d 318, 321 (5th Cir. 2008); *Toeller v. Wisconsin Department of Corrections*, 461 F.3d 871, 879 (7th Cir. 2006); *Touvell v. Ohio Department of Mental Retardation and Developmental Disabilities*, 422 F.3d 392, 405 (6th Cir. 2005); *Brockman v. Wyoming Department of Family Services*, 342 F.3d 1159, 1165 (10th Cir. 2003).[3] Relying on the holdings in these cases, UTEP contends that when Congress enacted the FMLA, it had no evidence before it that employers engaged in a pattern of discrimination in providing leave for personal medical conditions, and without such findings, the self-care-leave

---

[3] In an unpublished opinion, the Fourth Circuit summarily held, based on *Hibbs*, that Congress validly abrogated the States' immunity for FMLA claims based on the self-care provision. *Montgomery v. Maryland*, 72 Fed.Appx. 17, 19 (4th Cir. 2003)(unpublished). Prior to *Hibbs*, the Fourth Circuit had reached the opposite conclusion in *Lizzi v. Alexander*, 255 F.3d 128, 135-36 (4th Cir. 2001).

provision of the FMLA is an invalid abrogation of state sovereign immunity. We disagree with this argument for two reasons.

First, we are not persuaded that in order to uphold the self-care provision it is necessary to have a congressional record replete with evidence showing a pattern of gender-based discrimination specifically related to leave for personal medical conditions. The Supreme Court has already found in *Hibbs* that Congress had evidence before it in 1993 that nearly thirty years after the passage of Title VII, women still face pervasive discrimination in the job market and the States continued to rely on invalid gender stereotypes in the administration of leave benefits. *Hibbs*, 538 U.S. at 729-30, 123 S.Ct. at 1978-79. These invalid gender stereotypes include a belief that a woman's job is secondary to her role in the home. *See id.*, 538 U.S. at 729, 123 S.Ct. at 1978. The self-care provision is directed at that stereotype, but it is also directed at a related invalid stereotype: that women of child-bearing age take more leave than other employees. In light of *Hibbs*, the only question is whether the self-care provision exhibits congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. We conclude that it does.

Second, even if it can be said that Congress is required to compile a legislative record showing the existence of past and current gender-based discrimination to justify the enactment of the self-care provision of the FMLA, we conclude that the legislative history of the FMLA and the congressional record provides sufficient evidence and relevant congressional findings. We consider first the historical context in which the FMLA was enacted and its legislative history. Title VII of the Civil Rights Act of 1964 was intended to remedy discrimination in the workplace based on gender, among other things. *Kazmier v. Widmann*, 225 F.3d 519, 546 (5th Cir. 2000)(J. Dennis, dissenting opinion). In 1976, the Supreme Court held that Title VII did not protect against discrimination based on pregnancy under the theory that it is not discrimination based on sex, but

rather it is discrimination among women based on a medical condition. *General Electric Company v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). In response, Congress enacted the Pregnancy Discrimination Act and effectively overruled *Gilbert* by amending Title VII's definition of discrimination on the basis of sex to include discrimination on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C.A. § 2000e(k)(West 2003); *Kazmier*, 225 F.3d at 546, *citing Newport News Shipbuilding and Dry Dock Company v. E.E.O.C.*, 462 U.S. 669, 676, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983)(recognizing that the Pregnancy Discrimination Act overturned *Gilbert* and rejected the test of discrimination employed in that case). Nevertheless, the Pregnancy Discrimination Act did not affirmatively grant pregnant workers leave time or the right to return to their job but only required an employer to provide these benefits if the employer provided them to other temporarily disabled workers. *Kazmier*, 225 F.3d at 546.

In 1985, Congress began considering the issue of family and medical leave. *Id.* at 547, *citing The Family and Medical Leave Act of 1993: A Survey of the Act's History, Purposes, Provisions and Social Ramifications*, 44 DRAKE L.REV. 51 (1995). Representative Pat Schroeder introduced the Parental and Disability Leave Act of 1985 (PDLA) in the House of Representatives. *Kazmier*, 225 F.3d at 547. It provided for eighteen weeks of unpaid leave for both mothers and fathers of newborn or adopted children and twenty-six weeks of unpaid leave for non-work related disabilities. *Id.* The PDLA was not considered by the House but it was resubmitted in 1986 by Representative William Clay and renamed the Parental and Medical Leave Act of 1986 (PMLA). Two subcommittees and a full committee[4] conducted hearings to determine the extent of discrimination in the workplace against men and in favor of women in the workplace with regard to taking leave

---

[4] The Subcommittee on Compensation and Employee Benefits and the Committee on Post Office and Civil Service conducted joint hearings on the PMLA, as did the Subcommittee on Labor Management Standards. *Kazmier*, 225 F.3d at 547.

to care for sick family members. *Id.* The PMLA was not considered by the full House. *Id.*

In 1989, Representative Clay reintroduced the Family and Medical Leave Act in the House of Representatives. *Kazmier*, 225 F.3d at 547. It passed both the House and the Senate, but President Bush vetoed it in 1990. *Id.* In 1991, Senator Christopher Dodd introduced the Family and Medical Leave Act of 1991, which was identical to the bill vetoed by President Bush in 1990. *Id.* Congress amended the bill to change the amount of mandatory leave per year to twelve weeks. *Id.* The Act was passed by both the Senate and the House, but President Bush vetoed it in September of 1992. *Id.*

In 1993, Representative William Ford introduced the Family and Medical Leave Act to the House. *Kazmier*, 225 F.3d at 547. The Act's leave provisions were substantially similar to those of the amended 1991 version of the FMLA. *Id.* In considering enactment of the 1993 FMLA, the House of Representatives considered both new evidence of gender-based discrimination with regard to the administration of leave benefits, but it also reviewed the testimony given at hearings with respect to the "substantially similar" bills previously considered. *Kazmier*, 225 F.3d at 547, *citing* H.R.Rep. No. 103-8(1). For example, the House Report indicates that the 1993 FMLA had its roots in the 1985 proposed legislation and it made multiple references to the committee hearings held in 1986 in connection with the 1986 PMLA. *Id.* at 547-48, *citing* H.R.Rep. No. 103-8(1). Accordingly, in determining whether Congress had before it adequate evidence of gender-based discrimination when it enacted the self-care provision, we will not restrict our review to the 1993 legislative record but will also consider the evidence before Congress during these earlier hearings.

Before the adoption of the Pregnancy Discrimination Act of 1978, there was no federally required parity in the allowance for maternity and sick leave. *Laro v. New Hampshire*, 259 F.3d 1, 20 (5th Cir. 2001)(J. Lipez, dissenting opinion). The unavailability of maternity leave favored male

employees over those female employees who wanted to bear children. *Id.* This circumstance prevented many women from entering the workforce or advancing if they found their way into the workplace. *Id.* To rectify this inequity, the Pregnancy Discrimination Act required employers who provided sick leave for other conditions to offer the same level of benefits for maternity leave. *Id.*; 42 U.S.C.A. § 2000e(k). But the Pregnancy Discrimination Act did not address the gender-based stereotype that women of child-bearing age would take more leave than other employees. *Id.* In fact, the PDA had an unintended negative impact on women's opportunities in the workplace because "employers might find it cost-effective to discriminate against married women of child-bearing age, since these women would end up costing a firm more than they contribute to its worth." *Id.* at 20, *quoting* S.Rep. No. 102-68, at 73 (1991)(testimony of economist Deborah Walker).

It was in this context that Congress found it necessary to enact the FMLA and include the self-care provision. *Laro*, 259 F.3d at 21. Congress found that employment standards which apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender. 29 U.S.C.A. § 2601(a)(6). Significantly, Congress did not limit this finding to the family care provision. The stated purposes of the FMLA are to minimize the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis and to promote the goal of equal employment opportunity for women and men. 29 U.S.C.A. §§ 2601(b)(4) & (5). Congress also had evidence before it that, even where state laws and policies were not facially discriminatory, they were applied in discriminatory ways. *Hibbs*, 538 U.S. at 732, 123 S.Ct. at 1980. For example, Congress heard testimony that the lack of uniform parental and medical leave policies in the work place has created an environment where sex discrimination is rampant. *Id.*; *The Parental and*

*Medical Leave Act of 1987, Hearings Before the Subcommittee of the Senate Committee on Labor and Human Resources*, *Part 2*, 100th Cong. 536 (1987)(comments of Peggy Montes, Mayor's Commission on Women's Affairs, City of Chicago).

The self-care provision was not tacked onto the FMLA as some kind of benefit entitlement completely unrelated to the goal of promoting equal employment opportunity for women and men. Preceding enactment of the FMLA, the Senate Committee on Labor and Human Resources reported:

> Another significant benefit of the temporary medical leave provided by this legislation is the form of protection it offers women workers who bear children. Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy-related disability. Legislation solely protecting pregnant women gives employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect.

S.Rep. No. 102-68, at 35 (1991). The House Committee on Education and Labor made a similar finding:

> The FMLA addresses the basic leave needs of all employees. It covers not only women of childbearing age, but all employees, young and old, male and female, who suffer from a serious health condition, or who have a family member with such a condition. A law providing special protection to women or any defined group, in addition to be inequitable, runs the risk of causing discriminatory treatment. [This legislation], by addressing the needs of all workers, avoids such a risk.

H.R.Rep. No. 103-8, pt. 1, at 29 (1993).

Thus, Congress intentionally included the self-care provision in the FMLA to counter the stereotype that women take more advantage of leave policies than men and to provide women with protection from gender discrimination in the workplace which would have resulted from legislation providing special protection only for pregnant women. We conclude that Congress had before it sufficient evidence of gender-based discrimination in the administration of leave benefits to warrant

the enactment of prophylactic §5 legislation.  *See Hibbs*, 538 U.S. at 735, 123 S.Ct. at 1981.

Further, we conclude that Congress's chosen remedy, the self-care leave provision, is congruent and proportional to the targeted violation.  *See Hibbs*, 538 U.S. at 735, 123 S.Ct. at 1981. The failure of Title VII and the Pregnancy Discrimination Act to address the problem justifies prophylactic measures in response.  *Id.*  By creating an across-the-board, routine employment benefit for all eligible employees, Congress sought to ensure that pregnancy-related sick leave would no longer be stigmatized as an inordinate drain on the workplace caused by female employees, and that employers could not evade leave obligations simply by hiring men.  *Id.*  By setting a minimum standard of self-care leave for all eligible employees, irrespective of gender, the FMLA attacks the formerly state-sanctioned stereotype that women of child-bearing age are absent more than other employees, thereby reducing employers' incentives to engage in discrimination by basing hiring and promotion decisions on stereotypes.  *See Hibbs*, 538 U.S. at 737, 123 S.Ct. at 1983.  For these reasons, we conclude that § 2612(a)(1)(D) is congruent and proportional to its remedial object, and can be understood as responsive to, or designed to prevent, unconstitutional behavior.  We therefore decline to follow the reasoning in  *Nelson v. University of Texas at Dallas*, *Toeller v. Wisconsin Department of Corrections*, *Touvell v. Ohio Department of Mental Retardation and Developmental Disabilities*, and *Brockman v. Wyoming Department of Family Services*.  Because the trial court did not err by denying UTEP's plea to the jurisdiction on this ground, we overrule Issue One.  Having found that UTEP's sovereign immunity has been validly abrogated by the enactment of FMLA, it is unnecessary to address the remaining arguments raised by UTEP.  The judgment of the trial court is affirmed.


November 25, 2008                                    ANN CRAWFORD MCCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., Dissenting

## **DISSENTING OPINION**

I respectfully disagree with the majority's holding.

In *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S. Ct. 1114, 67 Empl. Prac. Dec. (CCH) ¶ 43,952 (1996), the Supreme Court articulated a two-part test for determining whether an act of Congress abrogates the states' Eleventh Amendment immunity. The test asks (1) whether Congress has unequivocally declared an intent to abrogate a state's immunity and (2) whether Congress has acted pursuant to a valid exercise of power.[1] 517 U.S. at 55, 116 S. Ct. at 1123.

Under the second prong of *Seminole*, in order to provide remedial or preventative protections under section 5 of the Fourteenth Amendment, Congress must act in order to protect or remedy one of the stated purposes of the Fourteenth Amendment that is linked to a pattern of constitutional violations.

> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. History and our case law support drawing the distinction, one apparent from the text of the Amendment.

*City of Boerne v. Flores*, 521 U.S. 507, 519-20, 117 S. Ct. 2157, 2164, 74 Fair Empl. Prac. Cas. (BNA) 62 (1997) (limiting congressional abrogation to the Fourteenth Amendment). Specifically,

---

[1] In enacting the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq.*, Congress clearly satisfied the first prong of the *Seminole* test: "An action to recover . . . damages . . . may be maintained against any employer (*including a public agency*) in any Federal or State court of competent jurisdiction . . . ." 29 U.S.C. § 2617(a)(2) (emphasis supplied).

Congress must establish a pattern of constitutional violations, as it relates to its remedial statute, when utilizing section 5 powers. *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 640, 119 S. Ct. 2199, 2207 (1999).

The majority's view today cannot be reconciled with the specific findings of Congress or the plain meaning of the self-care leave provision of FMLA. My issue with the majority is two-fold. First, the self-care provision of FMLA is distinguishable from the family-care provision in scope and purpose.[2] Second, prevention of gender discrimination in the workplace is treated by the majority as the primary purpose of the self-care provisions, a purpose which is not supported by Congress's findings or the historical record leading to the passage and enactment of FMLA.

As a preliminary matter, to seek relief under the self-care provision of FMLA, one must have "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" which is gender specific, as defined by the Department of Labor, includes "any period of incapacity due to pregnancy, or for prenatal care." 29 C.F.R. § 825.114(a)(2)(ii). Simply being pregnant, as opposed to suffering complications from pregnancy, is not a serious health condition and does not trigger FMLA

---

[2] In relevant part, the two provisions read as follows:

(1) Entitlement to leave

[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

.  .  .

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(C), (D).

protections. *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 952, 9 Wage & Hour Cas. 2d (BNA) 711 (7th Cir. 2004); *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1383, 10 Wage & Hour Cas. 2d (BNA) 1770 (11th Cir. 2005). Generally, a "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). When looking at the totality of those who are affected by serious or chronic illness in the United States, pregnancy-related complications make up only a small fraction of that total.

There is no evidence or authority to support the majority's contention that the self-care provision of FMLA was designed to protect women from employment discrimination allegedly arising from pregnancy-related illnesses -- much less, from employment discrimination *practiced by states*, related to pregnancy-related illnesses. The majority also do not cite to any authority substantiating a stereotype that female state employees of child-bearing age take more leave than other state employees.

Congress set forth Findings, which, in its opinion, warranted passage of the Act, at 29 U.S.C. § 2601. The Finding which is most relevant to this case states that "due to the nature of the roles of men and women in our society, the primary responsibility for *family caretaking* often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men . . . ." *Id.* at § 2601(a)(5) (emphasis added). Based on this Finding, the U.S. Supreme Court has understandably approved congressional application of FMLA to the states *for family leave purposes*.[3]

---

[3] *See Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 123 S. Ct. 1972, 8 Wage & Hour Cas. 2d (BNA) 1221 (2003) (hereinafter, "*Hibbs*"), discussed in greater detail below.

Conversely, the Finding most relevant to the *self-care leave* provisions makes no distinction between the sexes. *See id.* at § 2601(a)(4), which states merely that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods"; this Finding makes no distinction between male and female employees. Without legislative history connecting any self-care finding to a pattern of sex discrimination, we must give the self-care provision of FMLA its plain meaning, which is to allow any eligible employee with a serious medical condition the opportunity to take up to twelve weeks' unpaid medical leave without fear of losing his or her job.

The Senate Committee Report in support of the bill which became FMLA likewise recognizes the distinction between leave for family care and leave for self-care purposes. After discussing family care issues, the Report continues:

> In addition to the family leave purposes described above, [FMLA] provides for unpaid job protected leave and the continuation of any existing health insurance coverage during an employee's serious illness. *The fundamental rationale* for such a policy is that it is unfair for an employee to be terminated when **he or she** is struck with a serious illness and is not capable of working.

SEN. REP. No. 103-3, at 11 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1, 13 (emphases supplied). Unlike family care duties, which were found stereotypically to fall far more frequently upon female employees, the Committee recognized that both males and females suffer serious health conditions in substantially equal proportions.

In recognizing the distinction between the stereotype regarding women's role as primary-care givers and the gender-neutral need to care for one's own serious health conditions, Congress had before it the following finding:

> Recent studies provided to the [House Education and Labor] Committee indicate that men and women are out on medical leave approximately equally. Men workers experience an average of 4.9 days of work loss due to illness or injury per

year, while women workers experience 5.1 days per year. The evidence also suggests that the incidence of serious medical conditions that would be covered by medical leave under the bill is virtually the same for men and women. Employers will find that women and men will take medical leave with equal frequency.

H.R. REP. No. 101-28(I), at 15 (1989) (quoted by the Sixth Circuit in *Touvell v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 422 F.3d 392, 402, 10 Wage & Hour Cas. 2d (BNA) 1537 (6th Cir. 2005), *cert. denied*, 546 U.S. 1173 (2006)).

In rejecting UTEP's Eleventh Amendment defense, the majority reject a plethora of cases, almost all of which have found that individuals' efforts to sue a state (or state agency) under the self-care provisions of FMLA are barred and that Congress did not successfully abrogate the states' Eleventh Amendment immunity.

To understand the status of the case law in this regard, we need to begin with the Ninth Circuit's decision in *Hibbs v. Department of Human Resources*, 273 F.3d 844, 7 Wage & Hour Cas. 2d (BNA) 865 (9th Cir. 2001). In that case, Hibbs sought and obtained FMLA leave from his state job to care for his ailing wife. When he did not return from this leave pursuant to the Department's instructions, he was disciplined. He filed suit under, *inter alia*, FMLA, but the district court granted the state's motion for summary judgment. The Ninth Circuit reversed and remanded for trial. In doing so, however, it emphasized that the state's constitutional argument might well have been stronger under a self-care claim, and it stated: "We do not mean here to state any view with regard to the personal disability provision of the FMLA." 273 F.3d at 868 n.29.

The Supreme Court granted certiorari and affirmed, *sub nom. Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 123 S. Ct. 1972, 8 Wage & Hour Cas. 2d (BNA) 1221 (2003). In doing so, however, the Court made it clear that it was addressing *only* leave for family care. *See, e.g.*, *id*. at 725, 123 S. Ct. at 1976 ("We hold that employees of the State of Nevada may recover

money damages in the event of the State's failure to comply with the *family-care* provision of the Act.") (emphasis supplied); *see also id.* at 737, 123 S. Ct. at 1982 ("We believe that Congress' chosen remedy, the *family-care* leave provision of the FMLA, is 'congruent and proportional to the targeted violation' [citation omitted].") (emphasis supplied).

I am hard-pressed to think how the Court might more explicitly have stated its intention to limit its holding solely to the family-care provision of the Act.

Since the Supreme Court's decision in *Hibbs*, numerous courts have followed its holding. To date, six federal courts of appeals have explicitly followed the Court's lead in finding that the states have Eleventh Amendment immunity from employee suits under the self-care portion of the Act:

- **Fifth Circuit:** *Nelson v. University of Tex. at Dallas*, 535 F.3d 318, 13 Wage & Hour Cas. 2d (BNA) 1549 (5th Cir. 2008).

  Prior to *Hibbs*, the Fifth Circuit had held, in *Kazmier v. Widmann*, 225 F.3d 519, 526-27, 6 Wage & Hour Cas. 2d (BNA) 481 (5th Cir. 2000), that states had Eleventh Amendment immunity to suits under both subparagraphs (C) [family-care leave] and (D) [self-care].

  In *Nelson*, the court held: "[W]e agree with the rationale of the Sixth, Seventh, and Tenth Circuits that the Supreme Court's ruling in *Hibbs* applies only to subsection C. Therefore, this court's decision in *Kazmier* still remains the law of this circuit with respect to subsection D." 535 F.3d at 321.

- **Sixth Circuit:** *Touvell v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 422 F.3d 392, 10 Wage & Hour Cas. 2d (BNA) 1537 (6th Cir. 2005), *cert. denied*, 546 U.S. 1173 (2006).

  The court agreed that "*Hibbs* does not apply to the self-care provision . . . ." 422 F.3d at 400.

  The Sixth Circuit discussed and expressly rejected the Fourth Circuit's opinion in *Montgomery*:[4] "The Fourth Circuit gave no explanation for this statement, . . . and we do not consider it persuasive." 422 F.3d at 400 n.2.

---

[4] Fully cited and more thoroughly analyzed below.

- **Seventh Circuit:** *Toeller v. Wisconsin Dep't of Corrections*, 461 F.3d 871, 11 Wage & Hour Cas. 2d (BNA) 1380 (7th Cir. 2006).

  In holding that the plaintiff's claim was barred by the Eleventh Amendment, the court stated: "We note . . . that the Supreme Court was careful throughout *Hibbs* to state that it was deciding a case about the family-leave part of the FMLA; one would be hard-pressed to find anything in that opinion hinting that the ruling extended to all of § 2612(a)." 461 F.3d at 879.

- **Tenth Circuit:** *Brockman v. Wyoming Dep't of Family Servs.*, 342 F.3d 1159, 8 Wage & Hour Cas. 2d (BNA) 1737, 14 Amer. Disabil. Cas. (BNA) 1423 (10th Cir. 2003), *cert. denied*, 540 U.S. 1219 (2004).

  The court held that the "self-care provision in subsection (D) is not implicated by" *Hibbs* and that the "legislative history [of FMLA] does not . . . identify as the basis for subsection (D) a link between these two motivations and any pattern of discriminatory stereotyping on the part of the states as employers." 342 F.3d at 1164.

- **Eleventh Circuit:** *Batchelor v. South Fla. Water Mgmt. Dist.*, 242 Fed. Appx. 652 (11th Cir. 2007).

  In *Garrett v. University of Ala. at Birmingham Bd. of Trs.*, 193 F.3d 1214, 1219, 5 Wage & Hour Cas. 2d (BNA) 1153, 9 Amer. Disabil. Cas. (BNA) 1635 (11th Cir. 1999), *rev'd in part on other grounds*, 531 U.S. 356, 121 S. Ct. 955, 11 Amer. Disabil. Cas. (BNA) 737 (2001), which preceded *Hibbs*, the Eleventh Circuit had held that the state had Eleventh Amendment immunity in a self-care case under FMLA.

  In *Batchelor*, the court held that "*Garrett* . . . remains the law of this Circuit" regarding the self-care provision of FMLA. 242 Fed. Appx. at 653.

In three other circuits, the courts held, prior to *Hibbs*, that states enjoy Eleventh Amendment immunity from suits arising under the self-care provisions of FLMA. In these circuits, the courts have not been called upon to reconsider their holdings in light of *Hibbs*, but there is no reason to believe that they would now reach a different conclusion:

- **First Circuit:** *Laro v. New Hampshire*, 259 F.3d 1, 7 Wage & Hour Cas. 2d (BNA) 262 (1st Cir. 2001).

  This case involved solely a claim arising under the self-care provisions of the Act. In a thorough analysis of the issue, the First Circuit found a lack of congruence between the desire to eliminate sex discrimination and the self-care remedy which was sufficient to waive the state's Eleventh Amendment immunity. 259 F.3d at 16-17.

In *Hibbs v. Department of Human Resources*, the Ninth Circuit noted, with substantial approval, the distinction *Laro* drew between the constitutionality of applying to the states the family-care and self-care provisions of the Act. *See* 273 F.3d at 855.

- **Second Circuit:** *Hale v. Mann*, 219 F.3d 61, 6 Wage & Hour Cas. 2d (BNA) 108 (2d Cir. 2000).

   The court held that application of the self-care provisions of FMLA to a state agency violates the state's Eleventh Amendment immunity. 219 F.3d at 69.

- **Third Circuit:** *Chittister v. Department of Cmty. & Econ. Dev.*, 226 F.3d 223, 6 Wage & Hour Cas. 2d (BNA) 545, 25 Empl. Ben. Cas. (BNA) 1025 (3d Cir. 2000) (Alito, J.).

   In another self-care case, then-Judge Alito held that application of the Act to an employee of a state agency resulted in a lack of congruence and proportionality between the injury to be remedied and the means adopted to that end. In reviewing Congress's Findings, Judge Alito noted:

   > Notably absent is any finding concerning the existence, much less the prevalence, in public employment of personal sick leave practices that amounted to intentional gender discrimination in violation of the Equal Protection Clause. For example, Congress did not find that public employers refused to permit as much sick leave as the FMLA mandates with the intent of disadvantaging employees of one gender.

   226 F.3d at 228-29.

While the Third Circuit itself has not reconsidered Judge Alito's opinion, four district judges within its jurisdiction have unanimously agreed that *Chittister* survives *Hibbs*:

- *Savage v. New Jersey*, No. 05-2047, 2007 WL 642916 (D.N.J. Feb. 23, 2007).

   "The explicit and narrow holding in *Hibbs*, has not overturned the holding in *Chittister* that the self-care provision cannot be enforced against the States . . . . *Chittister* remains the law of this circuit . . . ." *Id.* at *5.

- *Wampler v. Pennsylvania Dep't of Labor & Indus.*, 508 F. Supp. 2d 416 (M.D. Pa. 2007)

   The court cited with approval the foregoing holding in *Savage*. *Id.* at 420-21.

- *Haybarger v. Lawrence County Adult Probation & Parole*, No. 06-862, 2007 WL 789657 (W.D. Pa. March 14, 2007) (Lancaster, J.).

The court held that *Hibbs* "was limited to the 'family-care' provision and does not affect the reasoning of *Chittister* with regards to the 'self-care' provision of the FMLA." *Id.* at *3 n.1.

- *Walker v. Department of Military & Veterans Affairs*, No. 2:08CV267, 2008 WL 2433091 (W.D. Pa. June 12, 2008) (Cercone, J.).

  The court held that "the *Hibbs* decision was limited to the 'family-care' provision and . . . the Third Circuit's holding regarding the 'self-care' provision of the FMLA remained unaffected." *Id.* at *2.

Similarly, while the Ninth Circuit has not again faced the issue, one district court within its jurisdiction has found Eleventh Amendment immunity in a self-care case:

- *Wennihan v. AHCCCS*, 515 F. Supp. 2d 1040 (D. Ariz. 2005).

  In a self-care case, the court distinguished *Hibbs* and concluded that its family-care holding was not applicable. Instead, the court followed the Tenth Circuit decision in *Brockman*, and held that the plaintiff's suit against an agency of the State of Arizona was barred by the Eleventh Amendment. *Id.* at 1046.

Finally, although this is apparently a case of first impression in the state courts of Texas, at least three other states' courts have joined the federal chorus in finding that self-care cases are barred by the Eleventh Amendment:

- **Louisiana:** *Matthews v. Military Dep't ex rel. La.*, 970 So. 2d 1089 (La. App. 1 Cir. 2007), *writ denied*, 976 So. 2d 177 (La.), *cert. denied*, ___ U.S. ____, 129 S. Ct. 82 (2008).

  In a self-care case, the Louisiana Court of Appeal also followed *Brockman* and found that Congress had not lawfully abrogated the state's Eleventh Amendment immunity. 970 So. 2d at 1090.

- **Maryland:** *Lizzi v. Washington Metro. Area Transit Auth.*, 384 Md. 199, 862 A.2d 1017, 10 Wage & Hour Cas. 2d (BNA) 1046 (2004), *cert. denied*, 545 U.S. 1116 (2005).

  In a self-care case, the Court of Appeals of Maryland followed *Brockman*, holding that *Hibbs* "*does not have any effect*" on the personal-leave provision of FMLA. *Id.* at 211-12, 862 A.2d at 1024-25 (emphasis in original). In doing so, the state court expressly rejected the Fourth Circuit's *Montgomery* decision.

- **Utah:** *Nicholas v. Attorney Gen.*, 168 P.3d 809, 101 Fair Empl. Prac. Cas. (BNA) 1070, 12 Wage & Hour Cas. 2d (BNA) 1468 (Utah 2007).

Upholding the state's Eleventh Amendment immunity, the court followed the Sixth Circuit's opinion in *Touvell.*

In summary, the federal courts of appeals for nine circuits (the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits),[5] a federal district court in one of the two circuits (the Ninth and the District of Columbia) which have not been presented with a controlling case, and the highest courts of three states (Louisiana, Maryland, and Utah) have concluded that Congress could not constitutionally abrogate the states' Eleventh Amendment immunity in regard to the self-care provisions of FMLA.

Despite the existence of a conflict in the circuits (albeit a 9-1 split), the United States Supreme Court has been given four opportunities to announce a contrary conclusion, and it has denied a writ of certiorari all four times. *See Touvell*, *Brockman*, *Matthews*, and *Lizzi*.

I am aware of two cases which have reached a contrary conclusion, neither of which, in my opinion, is well-reasoned and neither of which actually addresses the issue presented to our Court:

• **Fourth Circuit:** *Montgomery v. Maryland*, 72 Fed. Appx. 17 (4th Cir. 2003) (per curiam) (unpublished).

> Just two months after *Hibbs* was decided, the Fourth Circuit summarily cited it for the proposition that "Congress effectively abrogated the states' Eleventh Amendment immunity against causes of action based on the FMLA." *Id.* at 19. In so holding, the court did not notice, let alone discuss, any distinction between the family-care and self-care provisions of the Act.[6]

---

[5] I have not sought to discuss the numerous federal district courts cases in which the court has simply followed and applied the law of that circuit. I have also not discussed at least three district court cases which arose within the Fifth Circuit after *Hibbs*, but prior to the *Nelson* decision. *See Bryant v. Mississippi State Univ.*, 329 F. Supp. 2d 818, 821-22 n.2, 825 (N.D. Miss. 2004); *Solley v. Big Spring State Hosp.*, No. Civ.A.1:03-CV-094-C, 2004 WL 1553423 (N.D. Tex. July 12, 2004); *Jordan v. Texas Dep't of Aging & Disabilities Servs.*, No. 9:05CV161, 2006 WL 1804619 (E.D. Tex. June 28, 2006).

[6] *See Bryant*, 329 F. Supp. 2d at 821-22 n.2, where the court rejected the holding in *Montgomery*: "With no analysis of the issue, the Fourth Circuit reached a conclusion opposite of the one this Court reaches today. . . . In the absence of more consideration, this Court is unpersuaded by such a general conclusion."

The court's cursory treatment of *Hibbs* may well be attributable to the fact that assertion quoted above is pure dictum, since the court then dismissed the lawsuit for failure to state a claim upon which relief can be granted. *Id.* at 20.

• *Hamilton v. Niagara Frontier Transp. Auth.*, Nos. 00-CV-300SR, 00-CV-8635R, 2007 WL 2241794 (W.D.N.Y. July 31, 2007) (Schroeder, Mag. J.).

In *Hamilton* also, the Magistrate Judge stated summarily that, in *Hibbs*, the Supreme Court "held that the FMLA is a valid abrogation of state immunity." *Id.* at *13. The district court's opinion did not recognize, let alone discuss, any distinction between the family-care and self-care provisions.

The court likewise did not reference, even in passing, the Second Circuit's contrary decision in *Hale*.

Thus, the only two cases which have found a state's Eleventh Amendment immunity to have been abrogated by the self-care provisions of FMLA did so in opinions which overlooked the distinction, so carefully and repeatedly noted by the Supreme Court itself (*see*, *e.g.*, 538 U.S. at 737, 123 S. Ct. at 1982[7]), between family-care and self-care leaves.

The majority opinion flies in the face of a mountain of contrary and persuasive legal authority. I therefore respectfully dissent from its holding that *Hibbs* abrogated Texas' Eleventh Amendment immunity from Herrara's FMLA claim arising from a self-care leave.

The majority deem it unnecessary to consider Herrera's alternative contentions that Texas has voluntarily waived its sovereign immunity by State law or by provisions in the UTEP handbook. In view of the majority's holding, I do not deem it necessary to discuss them in any detail. It will suffice to say that I believe Herrera's contention that UTEP waived the State's immunity by provisions in its Handbook to be without merit. *See Wells v. Texas A & M Univ. Sys.*, No. 06-04-00001-CV, 2004 WL 2114438 (Tex. App.--Texarkana Sept. 24, 2004, pet. denied), *cert. denied*, 546 U.S. 814 (2005).

---

[7] "We believe that Congress' chosen remedy, *the family-care leave provision* of the FMLA, is 'congruent and proportional to the targeted violation,' . . ." (emphasis supplied).

KENNETH R. CARR, Justice

November 25, 2008